October 27, 2020

The Honorable Debra A. Livingston
Chief Judge, United States Court
of Appeals for the Second Circuit
40 Foley Square New York, NY 10007

Re: *United States v. Beltran Leyva (Guzman Loera)* Case No: 19-2239

Dear Judge Livingston,

Please, accept this document additionally to what my attorney has already submitted to this Court.

## POINT I

## **EXTRADITION**

On January 19, 2017, the Government of Mexico granted the United States Government two extradition orders that the United States Government requested through its embassy in Mexico to extradite Mr. Guzman: one for the Western District of Texas and another for the Southern District of California. That same day (January 19, 2017), at 1pm, the Government of Mexico handed Mr. Guzman over to the United States Government at the border between Ciudad Juárez and El Paso Texas, to face his two extraditions. But Mr. Guzman did not reach either of those two districts. Instead, he was taken to New York.

This extradition was illegal, as there was never an extradition request from the Eastern District of New York. The United States Government alleged that they took Mr. Guzman to New York, because of a request it made to Mexico regarding the specialty

1

rule (rule 17). Mr. Guzman wonders; how did the Government get Mexico's waiver, if there was never a request for rule 17? It is clear that this was a great fraud.

Mr. Guzman's attorneys filed a motion demanding that the Government submitted the request for extradition from the Eastern District of New York, but the prosecutors said they could not deliver the request, because it contained the names of informants they had to protect. Prosecutors for the Eastern District said that whenever they delivered the 3500 material, they would also serve the extradition request from the Eastern District of New York. When they delivered the 3500 material, they never delivered the extradition request; and this is because it never existed.

Mr. Guzman's extradition was not legal, it was arbitrarily done, violating the extradition treaty. The prosecutors who handled the case did not make a request to the Mexican Government through the United States Embassy in Mexico, and certified by a magistrate judge, like its supposed to. Therefore, there was never a valid extradition request. There was no extradition request that was carried out diplomatically by the United States Embassy in Mexico, as specified in the extradition treaty between the United States and Mexico. The United States Government violated the extradition treaty. Therefore, Mr. Guzman's conviction must be overturned and he will have to be prosecuted in the Western District of Texas and / or the Southern District of California, the only districts where the United States requested Mexico to extradite him.

## POINT II

## IPs/SERVERS

From March 2011 to January 9, 2012, the United States Government, with the help of the Dutch Government, through requests through the Mutual Legal Assistance

Treaty, conducted surveillance and search for network communications. Although the surveillance allegedly targeted three primary servers, only two, associated with IP addresses ending in 226 and 70, were actually allegedly used by suspected cartel members.

According to the agent of the case Stephen Marston, who testified for the Government in the trial against Mr. Guzman, the surveillance of the Dutch server generated thousands of calls that the prosecution imputed to Mr. Guzman. During those calls, the Government alleged that Mr. Guzman discussed the trafficking of cocaine and methamphetamine to the United States. The Government also alleged that in those calls, Mr. Guzman spoke about acts of violence committed by members of the cartel, payments to corrupt police officers and efforts to evade detection by law enforcement.

Of these 117,000 calls that the Government gave to Mr. Guzman's lawyers to review, none of those calls were from Mr. Guzman (with Guzman's voice speaking), as the Government alleged. The calls that the Government presented at trial, that according to the Government, had Mr. Guzman speaking, did not have a judicial order, since those calls came from an IP that ends in 103. This IP ending in 103 never had a warrant, through requests through the Mutual Legal Assistance Treaty. The surveillance was supposedly targeting three primary servers, but this IP ending in 103 was not one of those.

The U.S. Government told the jury during closing arguments, that those calls they presented in the trial that came from the IP that ended in 103, that they claimed to be from Mr. Guzman, had a court order, but that was not true. These misrepresentations are very serious, as they confused the jury. The jury took into account what the Government said during the closing arguments about those calls, since the jury did not have any

3

reason to distrust the representations that the prosecution was making. This was a huge fraud. The U.S. Government obtained these calls with the collaboration of the Dutch government, but the U.S. Government used Mr. Guzman's name in bad faith to obtain the cooperation of the Dutch Government. The U.S. Government used a call that came from the IP that did not have a search warrant, to justify why it was necessary to continue with the surveillance, and thus, be able to continue acquiring the extensions month by month from the Dutch judge.

Therefore, suppression of these calls is appropriate, because the U.S. Government was in command, directing the foreign surveillance. The Dutch were simply acting as their agents.

In addition, another Government witness, Pedro Flores, said that the voice in the call that was placed by the U.S. Government during his testimony, and the voice in the exemplary Rolling Stones video, were different. Not even the Government witness could identify Mr. Guzman's voice in the call; a witness who had allegedly met and spoken with Mr. Guzman many other times, and who alleged that he could recognize Mr. Guzman's voice. This is another indication of the fraud committed by the U.S. Government.

Because these damaging calls were unconstitutionally obtained from IP ending in 103 and were wrongly admitted, this Court should revoke Mr. Guzman's conviction.

## POINT III

## FLEXISPY SOFTWARE

The U.S. Government alleged that there were three communications IPs (communication servers) that supposedly belonged to Mr. Guzman. The Government

4

alleged through motions that of the three IPs that had warrants from the Netherlands, two of them (one that ended in 26 and the other that ended in 70) was used for calls and the other one was used for messages (IP ending in 27). The Government claimed that the IP ending in 27 was used for text messages. In none of the three IPs is there evidence of Mr. Guzman.

During Mr. Guzman's trial, the U.S. Government presented a series of text messages through its witnesses, Steven Marston and Christian Rodriguez. These witnesses read the content of the messages to the jury, and then explained that these were messages from Mr. Guzman with third parties. Both witnesses said that these messages came from the FlexiSpy system, and also, from Christian Rodriguez personally, who allegedly provided them to the Government. Specifically, Christian Rodriguez said that in December 2011 and January 2012, acting under the direction of the U.S. Government, he personally received text messages and other data from the Amazon accounts that he had obtained for Mr. Guzman.

But on a previous motion before trial, the Government said that it had obtained the text messages through the IP ending in 27. So what is the real version? The Government has repeatedly lied to its liking, and now we see it again. This was a very big fraud. The Government changed its version of how it got the text messages twice. First they said they had been obtained by the IP ending in 27 and then they said they obtained them through Christian Rodriguez.

All this is the pure telling of the United States Government and nothing more. Besides, the Government never gave evidence to show that Mr. Guzman, through Christian Rodriguez, bought that Amazon server. The Government never provided any evidence, such as receipts, proving that Mr. Guzman or Rodriguez paid for that service.

5

How can we believe them if they first said one version and then another? Mr. Guzman wonders; where would they find those messages that the Government atributed to him?

The Government alleged that in all these text messages, Mr. Guzman discussed drug trafficking to the United States and other countries. The Government also alleged that Mr. Guzman discussed in these messages his escaping from Mexican authorities in Cabo San Lucas, Mexico, in approximately February of 2012. Judge Cogan allowed all this evidence to come in, and to be read to the jury. Evidence that, whether true or not, should not have come in, because it was illegally obtained.

## POINT IV

## JURY MISCONDUCT

Apart from what my attorney has already alleged, I would like to add the following: the Government said that there was an avalanche of evidence, so that it did not matter if the jury had followed the media, Twitter feeds, or seen the articles of the allegations of child rape (which was not part of the evidence), or seen the articles alleging misconduct of defense attorney Lichtman, that none of that mattered, because I would still have been found guilty. Certainly, there was an overwhelming amount of "prejudicial" and "appalling" evidence, as Judge Cogan repeated over and over again, but as alleged in the previous points of this document, that evidence was obtained fraudulently. Since my extradition to New York, the United States Government has committed fraud after fraud, and Judge Cogan in one way or another helped them get away with it.

## POINT V

## JURY INSTRUCTIONS

Judge Cogan's instructions were wrong, as he made the jury understand or at least assume that the possibility of a hung jury was not possible. In his instructions, Judge Cogan repeatedly told the jury that they had to decide unanimously, making it sound as though they had no other option; as though there was no possibility for any of the jurors to disagree, as though if one juror disagreed, he would have to change his or her mind to think like the others.

## POINT VI

### VIOLATION 27/ MURDERS

The district court upheld Violation 27, charging Mr. Guzman with a series of murders, without admitting evidence that those people were actually dead. There was not a single piece of evidence to show that these people were dead. The Government only relied on the testimonies of its witnesses to confirm these allegations of deaths.

The original indictment was for drug trafficking, and then they added those deaths (Violation 27), which was not part of the original indictment. They never gave Mr. Guzman evidence of time, manner, or place. There are no reports or documents to prove that these people died, such as death certificates, news reports, photos of corpses, or autopsy reports, not even their relatives came to corroborate the disappearance of those people. There is nothing. All we have is the word of the Government's witnesses. But those witnesses had their own motives for lying; sentence reductions and/or 5K-1 letters.

A DEA agent, Zappone, said that he investigated Mr. Guzman for a year in Chicago, and said that during that year Mr. Guzman did not bring drugs and he was just a myth. Another Government witness at trial, Vicente Zambada, said that Mr. Guzman was

given so much publicity by the Governments of Mexico and the U.S., to make him big and thus be able to arrest him. This case is completely political.

The U.S. Government mentioned 26 different murders, but focused on two: the murder of Ramon Arellano and Rodolfo Carrillo. The brothers of Ramon Arellano are in prison in the United States and were in prison at the time of Mr. Guzman's trial. As a matter of fact, at least one of them is believed to be cooperating. Therefore, if the brothers of this alleged dead person are under the United States custody, why didn't the Government bring them to Mr. Guzman's trial to testify as to their brother's death? After all, whom better than the brothers or family members to corroborate someone's death?

Rodolfo Carrillo's brother, Vicente Carrillo, is in prison in Mexico and was in prison at the time of the trial. The U.S. Government could have easily requested from Vicente Carrillo, a sworn affidavit, talking about his brother's death, but they did not do so. During the 6 years of Enrique Peña Nieto's presidency in Mexico, the Mexican Government colaborated with the United States Government. Therefore, U.S. Government could have easily requested the Mexican Government to help them get that affidavit.

In this case, Judge Cogan's decision to allow the government to allege Violation 27 did undeniable harm, ruining Mr. Guzman's conviction.

### POINT VII

### CONDITIONS OF CONFINEMENT

The Government said that it was necessary for the SAMs rules to be imposed on Mr. Guzman, because supposedly, Mr. Guzman was very dangerous, and that he could have witnesses killed from inside jail or that he could escape. But the reality is that this exaggeration was, because they did not want him to be able to defend himself, and that's

8

exactly what happened; Mr. Guzman was not able to defend himself properly due to the exaggerated conditions of confinement in his entire process.

However, Mr. Guzman's trial, the identity of the protected witnesses is already exposed, so there is no need to continue having him submitted under these rules. Mr. Guzman is living a nightmare, and feels humiliated by the U.S. Governemnt. He is 63 years old, and is not getting any younger. These conditions are harder and harder to endure each day.

If there was some kind of security concern, that concern no longer exists. No one that the Government was allegedly protecting has died during these four years. It has been demonstrated that Mr. Guzman's situation is political and nothing more, since the Governments of the United States and Mexico, for years, were in charge of giving life and magnifying the myth of "El Chapo Guzmán", turning this character into a villain. This is what we heard from the Government witness, Vicente Zambada, who said during his testimony at the trial that both governments gave Mr. Guzman so much publicity to make him great and thus be able to arrest him. Or the DEA agent Zappone, who said that he investigated Mr. Guzman for a year in Chicago, and said that during that year Mr. Guzman did not take drugs to Chicago and it was a myth.

Since his arrival to New York on January 17, 2017, Mr. Guzman has not been able to speak to his wife. The Government alleged that Mr. Guzman could not speak to pretty much anyone, because of security reasons, because he could run crimes from inside of prison or even escape from prison.

It has been shown that Mr. Guzman had the help of Mexican authorities to escape from Mexican prisons. ADMAX Florence, is supposedly the safest prison in the United States, where no one has escaped. And the United States always prides itself on

having an incorruptible justice system, so those fears are not real, and it is clear that the restrictions only serve to punish Mr. Guzman, without any legitimate purpose.

Mr. Guzman urges this Court to please lift the SAMs or at least modify them, so that he can speak with his wife, Mrs. Emma Coronel. Mr. Guzman's calls and social visits are monitored live by FBI agents. Therefore, these calls and social visits with his wife, would also be monitored by the FBI, so they would be listening to what is being said at all times, and could end a call or cut them short them if they hear something suspicious, which won't be the case.

## **CONCLUSION**

For all these reasons, this Court should reverse Mr. Guzman's conviction and grant a new trial.

Respectfully submitted,


    Joaquin Guzman Loera
        Appellant

10